# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

**DAVONE JACKSON,**

     **Plaintiff,**

**v.**

**REALPAGE, INC. d/b/a LEASING DESK,**

    **Defendant.**

**Case No. 3:18-cv-00012**

**District Judge William L. Campbell, Jr.**

## DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

  RealPage, Inc. ("RealPage"), by counsel, files this memorandum of law in support of its Motion for Summary Judgment seeking dismissal with prejudice of all claims asserted by Plaintiff Davone Jackson ("Plaintiff").

# TABLE OF AUTHORITIES

Page

I.      INTRODUCTION ........................................................................................ 1

II.     THE TENANT SCREENING MARKET ................................................... 3

III.    SUMMARY OF MATERIAL FACTS ....................................................... 6

        A.      RealPage's Tenant Screening Service and Procedures ........................... 6

        B.      RealPage's Process for Responding to Customer Disputes ................... 10

        C.      Tenant Screening Report Pulled by Midtown Estates ......................... 10

IV.     LEGAL STANDARD ............................................................................... 13

V.      LEGAL ARGUMENT ............................................................................. 14

        A.      RealPage Did Not Negligently Violate § 1681e(b) ............................ 14

                1.      Plaintiff's discovery responses proposed only a theory of strict
                        liability, which is contrary to law and requires judgment for
                        RealPage. ............................................................................ 16

                2.      The record evidence proves that RealPage acted reasonably, and
                        Plaintiff lacks any contrary proof. ............................................. 17

        B.      RealPage Did Not Willfully Violate § 1681e(b) ................................ 21

        C.      RealPage Did Not Violate § 1681i ................................................... 23

VI.     CONCLUSION ........................................................................................ 24

-i-

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Allstate Ins. Co. v. Tenant Screening Services, Inc.*,
914 P.2d 16 (1996)................................................................................15

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...........................................................................13, 14

*Beverly v. Diamond Transportation Srvs, Inc.*,
No. 98-2230 (4th Cir. 1999) ................................................................15

*Bryant v. TRW. Inc.*,
689 F.2d 72 (6th Cir. 1982) .................................................................15

*Bynum v. Cavalry Portfolio Servs., LLC*,
No. 04-cv-0515, 2005 WL 2789199 (N.D. Okla. Sept. 29, 2005)..........................20

*Cambridge Elecs. Corp. v. MGA Elecs., Inc.*,
227 F.R.D. 313 (C.D. Ca. 2004) .......................................................17, 18

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...........................................................................13, 21

*Copeland v. Machulis*,
57 F.3d 476 (6th Cir. 1995) .................................................................14

*Cure v. Pedcor Mgmt. Corp.*,
265 F.Supp.3d 984 (D. Neb. 2016)..........................................................4

*EEOC v. Freeman*,
961 F. Supp. 2d 783 (D. Md. 2013) ........................................................4

*Gardner v. City of Cleveland*,
656 F. Supp. 2d 751 (N.D. Ohio 2009)......................................................14

*Hayes v. Equitable Energy Res. Co.*,
266 F.3d 560 (6th Cir. 2001) ................................................................20

*Jayne H. Lee, Inc. v. Flagstaff Indus. Corp.*,
173 F.R.D. 651 (D. Md. 1997)................................................................16

*Krippelz v. Ford Motor Co.*,
750 F. Supp. 2d 938 (N.D. Ill. 2010) .......................................................17

# TABLE OF AUTHORITIES
(continued)

*Moore v. First Advantage Enter. Screening*,
  No. 4:12CV792, 2013 U.S. Dist. LEXIS 54907 (N.D. Ohio. Apr. 17, 2013) ....................2, 21

*Mulloy v. United States*,
  884 F.Supp.622 (D. Mass. 1995) ..........................................................................15

*Nelski v. Trans Union, LLC*,
  86 F. App'x 840 (6th Cir. 2004) ...............................................................14, 16, 22

*Safeco Ins. Co. of Am. v. Burr*,
  551 U.S. 47 (2007) ...................................................................................21, 22

*SEC v. Elfindepan*,
  206 F.R.D. 574 (M.D.N.C. 2002) ..........................................................................16

*Smith v. LexisNexis Screening Solutions, Inc.*,
  837 F.3d 604 (6th Cir. 2016) .........................................................................21, 22

*Taylor v. CoreLogic SafeRent, LLC*,
  Case No. 13-cv-3435, 2014 U.S. Dist. LEXIS 184413 (N.D. Ga. Oct. 23,
  2014) ....................................................................................................23

*Unites States v. Diebold, Inc.*,
  369 U.S. 654 (1962) ......................................................................................14

*Villaflor v. Equifax Info.Servs.*,
  ..........................................................................................................15

*Wantz v. Experian Info. Solutions, Inc.*,
  386 F.3d 829 (7th Cir. 2004) .............................................................................24

*Wenning v. On-Site Manager, Inc.*,
  No. 14cv9693, 2016 WL 3538379 (S.D.N.Y. June 22, 2016) ..................................................14

**Statutes**

15 U.S.C. § 1681e ...........................................................................................16

15 U.S.C. § 1681e(b) .................................................................................. *passim*

15 U.S.C. § 1681g(a) ........................................................................................24

15 U.S.C. § 1681i....................................................................................2, 3, 23, 24

15 U.S.C. § 1681i(a)(1)(A) ..................................................................................23

Case 3:18-cv-00012   Document 43-1   Filed 01/03/19   Page 4 of 30 PageID #: 200

15 U.S.C. § 1681i(a)(6) ......................................................................................23

42 U.S.C. § 1437n(f) .............................................................................................4

42 U.S.C. § 13661 ..................................................................................................4

42 U.S.C. § 13663 ..................................................................................................4

**Other Authorities**

24 C.F.R. § 960.204 ......................................................................................4, 8, 11

Center for Identity Management and Information Protection,
*Hiding in Plain Sight? A Nationwide Study of the Use of Identity
Manipulation by Registered Sex Offenders* (February 2015) ................................19

Fed. R. Civ. P. 26(e) ............................................................................................17

Fed. R. Civ. P. 37(c)(1) ........................................................................................17

Fed. R. Civ. P. 56(c) ............................................................................................13

http://pubs.napbs.com/pub/D57EDE10-A720-5C5D-BBCE-21CBC45A276C.....................18, 19

http://www.ca4.uscourts.gov/opinions/Unpublished/982230.U.pdf.] ..........................15

http://www.uniformlaws.org/Committee.aspx?title=Criminal%20Records%20Acc
uracy...............................................................................................................5

https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=
bkmk .................................................................................................................5

https://www.census.gov/newsroom/press-releases/2017/mover-rates.html .....................3

https://www.ftc.gov/sites/default/files/documents/reports/under-section-318-and-
319-fair-and-accurate-credit-transaction-act-2003/041209factarpt.pdf...................20

https://www.hud.gov/sites/documents/HUD_OGC GuidAppFHAStandCR.pdf
(April 4, 2016) ................................................................................................4

U.S. Government Accountability Office Report to Congressional Requesters,
*Criminal History Records: Additional Actions Could Enhance the
Completeness of Records Used for Employment-Related Background Checks,*
GAO-15-162, p. 38 (Feb. 2015), available at
https://www.gao.gov/assets/670/668505.pdf ...............................................................18

Case 3:18-cv-00012   Document 43-1   Filed 01/03/19   Page 5 of 30 PageID #: 201

## I.  INTRODUCTION

RealPage is an industry-leading provider of property management software systems and related services for the rental housing industry.  One of the important systems that RealPage offers is a tenant background screening solution known as "LeasingDesk" that enables owners and managers of rental housing properties to keep their communities safe by screening potential tenants for matching criminal records.

It is no surprise that in establishing the Fair Credit Reporting Act ("FCRA"), Congress did not impose a strict liability standard, but rather a standard of "maximum possible accuracy," intending not only to make sure that records not belonging to an applicant are avoided, but also that records that do belong to the applicant are not missed.  While the challenges of determining whether a criminal record relates to an applicant are great, the consequences of missing an applicable record are even greater.  The court system and the press are replete with disturbing stories of one resident murdering, raping or assaulting another resident, and even include cases of child molestation.  One common theme is that the perpetrator had prior convictions that if known could have prevented that individual from moving into the property.  Those severe consequences must be balanced against the issues caused by the lack of identifying information provided by courts.  Tightening of matching processes to reduce the number of records reported will necessarily result in failing to report accurate records.

Throughout the last two decades, RealPage has developed a comprehensive approach to achieving the proper balance that leverages technology in innovative ways to assure the maximum possible accuracy of its reports, and which has resulted in an extraordinary 99.9% accuracy rate. RealPage has worked to achieve maximum possible accuracy, making ongoing – and in some cases highly innovative – changes to address emerging issues.  Additionally, in designing its procedures, RealPage followed Federal Trade Commission ("FTC") guidance that recognizes that achieving

accuracy fundamentally and inextricably involves the existence and execution of the consumer dispute process to discover possible inaccuracies, a principle long-recognized by the FTC.  In its attempt to better aid consumers, RealPage instituted a process that goes beyond the FCRA's requirements by allowing properties to submit a dispute to RealPage before deciding on an application.  This additional process is sensible given that the person who has actually met and dealt directly with the applicant is by far the best able to use any available demographic information to take the final step in determining whether a record relates to an applicant.

These procedures were followed with respect to the report requested about Plaintiff in March 2016.  Likewise, upon receiving a dispute seven months later in October 2016, RealPage promptly reinvestigated the issue and then notified Plaintiff and his potential landlord that the disputed records had been inadvertently attributed to Plaintiff and should be removed from consideration.  Plaintiff later moved into the apartment, where he continues to live today.

Against this background, Plaintiff alleges that RealPage violated two sections of the FCRA. First, he claims that RealPage violated 15 U.S.C. § 1681e(b), which requires the maintenance of "reasonable procedures" designed to assure "maximum possible accuracy" of consumer reports. Second, he alleges that RealPage violated 15 U.S.C. § 1681i by failing to conduct a "reasonable investigation" into his dispute.  Both claims fail.

With respect to the first provision, Plaintiff bears the burden to prove that RealPage's procedures under § 1681e(b) were unreasonable.  Summary judgment should thus be granted under § 1681e(b) in this action for two discrete reasons.  First, Plaintiff's sole basis for claiming that RealPage violated § 1681e(b) was the transmission of "inaccurate" records after the landlord utilized RealPage's software and generated a report.  Under well-settled law, that attempt to impose strict liability simply due to the existence of an error is invalid under § 1681e(b).  Second, the

2

evidence produced by RealPage in discovery demonstrates the reasonableness of its procedures as a matter of law. And, Plaintiff has no competing evidence by which to claim that RealPage should have operated in some other manner than it did here.

Plaintiff's claim under § 1681i also fails. Plaintiff alleges in his Complaint that RealPage did not respond to his dispute in 2016 within the thirty-day timeframe specified under the statute, and that its response stated its intention to "continue to disseminate" the challenged information. That is incorrect. The undisputed evidence proves that RealPage responded to Plaintiff's dispute in less than 20 days, transmitting the results of the dispute to Plaintiff and his potential landlord. Thus, summary judgment should be granted.

## II. THE TENANT SCREENING MARKET

When our society was less mobile, we relied on the direct knowledge of our relatives, neighbors and business associates to assist us in assessing certain risks and making personal decisions. Today, people can easily move from one side of the country to the other with few barriers.[1] The tenant screening industry is composed of Consumer Reporting Agencies ("CRAs") that are focused on assisting owners, landlords, and managers of residential properties in evaluating prospective tenants and assessing the risks associated with potential tenancies. One tool to address the anonymity created by mobility is the criminal history report. These reports contain highly relevant (or "critical") information on an applicant's criminal history and provide properties with insight into whether an applicant has the propensity for violent, abusive, or otherwise criminal behavior.

---

[1] According to the U.S. Census Bureau, approximately 1 in 5 renters (or 21.7% of renters) move every year. *See* https://www.census.gov/newsroom/press-releases/2017/mover-rates.html.

The high stakes involved in protecting residential communities and preventing life-altering or fatal incidents make review of an applicant's criminal history essential in today's societal climate. For example, in 2016 in Nebraska, a tenant's minor child was kidnapped and raped by another resident who had been allowed to move into a rental community without first undergoing a background check.[2] Had the landlord conducted a background check, it would have been discovered that the perpetrator had multiple convictions for assault and public indecency. Such information could have disqualified the applicant from tenancy at a property where young children lived, or at least prompted further inquiry by the landlord.

Considering the irreversible harms involved with criminal conduct in a residential community, public policy also strongly favors full disclosure of relevant criminal records. As the Department of Housing and Urban Development ("HUD") has noted, "[e]nsuring resident safety and protecting property are often considered to be among the fundamental responsibilities of a housing provider, and courts may consider such interests to be both substantial and legitimate."[3] Criminal history reports are required to be used in the tenant screening process for public housing, including to screen for sex offenders, drug use/creation, and drug-related crimes.[4] Indeed, courts have long recognized that "[c]riminal history information is an important, and in many cases essential, part" of the background screening process, which includes keeping existing occupants safe. *EEOC v. Freeman*, 961 F. Supp. 2d 783, 786 (D. Md. 2013).

---

[2] *Cure v. Pedcor Mgmt. Corp.*, 265 F.Supp.3d 984, 988–89 (D. Neb. 2016).
[3] "Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions," https://www.hud.gov/sites/documents/HUD_OGC GuidAppFHAStandCR.pdf at pp. 4-5 (April 4, 2016).

[4] 24 C.F.R. § 960.204; 42 U.S.C. § 1437n(f); 42 U.S.C. § 13661; 42 U.S.C. § 13663.

4

Thus, in instances where it may be unclear whether a criminal record belongs to an applicant, public policy dictates that properties should still be apprised of the potential criminal history so that they may make as informed a decision as possible. To state the issue more directly, how can the inconvenience of an applicant who has to dispute a record with the property or CRA compare to the rape, assault or murder of an existing resident?

With over 3,100 counties and county equivalents in the United States, compiling complete and accurate criminal records data for use and inclusion in screening reports is a monumental task.[5] This task has become even more complicated over the past ten years, as each jurisdiction has developed its own rules as to what identifying information about the criminal can be made public.[6]

Amidst these competing concerns, tenant screening companies must balance the considerations of tenant and community safety with informational accuracy in the generation of screening reports. This essentially involves finding a balance between "false positives" and "false negatives." A "false positive" in this context is the association of a criminal record with a tenancy applicant when that record does not belong to the applicant. A "false negative" is the failure to identify or match a criminal record that does belong to an applicant.

Striking this balance is no easy feat, which is likely why the FCRA is not a strict liability statute. Any system of binary classification depends on the information available in each data set. In the screening context, the data sets used for matching are: (i) the information provided by the applicant; and (ii) the information about offenders provided by courts and other public record access points. The process of matching criminal records therefore necessarily depends on the

---

[5] https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk.

[6] This issue is one of the reasons that the Uniform Law Commission has established a Committee on Criminal Records Accuracy, drafting model legislation to improve the quality of criminal records at the state level. http://www.uniformlaws.org/Committee.aspx?title=Criminal%20Records%20Accuracy.

5

integrity, consistency, and relevance of the information in these data sets, and it is complex and ever developing.

In this context, screening companies strive to create procedures designed to match the most consistent and available information on criminal records given the limitations identified above. However, any set of matching procedures cannot be so unbalanced as to miss a large percentage of records which actually belong to applicants. This is especially true where a "false negative" results in a failure to apprise a property of an applicant's relevant criminal history and potentially puts the residents of the property and local community at risk.

## III.    SUMMARY OF MATERIAL FACTS

### A.    RealPage's Tenant Screening Service and Procedures

RealPage provides property managers and owners with a license to use software that allows potential landlords to generate tenant screening reports of potential tenants that include, among other things, publicly-available criminal history information.  Statement of Undisputed Materials Facts ("SUF"), ¶ 1.  If those customers desire to run a background check on a housing applicant, they collect personal information from the applicant and then input that information into RealPage's licensed software.  SUF ¶ 2.  Through the LeasingDesk user interface, the applicant's first name, middle name, last name, birth date, gender, current and previous addresses, and property location state are input by a prospective landlord or the applicant.  *Id*.  Utilizing the full identifying information that is input by the potential landlord into RealPage's LeasingDesk software, the software uses a proprietary matching algorithm to link archived criminal records to the identified applicant.  SUF ¶ 3.

Once prompted, RealPage's software is designed to match the most consistent and available information on any public record to the information provided by the landlord requesting the report.  SUF ¶ 4.  To facilitate that process, RealPage maintains a database of up-to-date

6

criminal record information retrieved from government sources, which RealPage's software then uses to generate reports. SUF ¶ 5. At all relevant times, it has been RealPage's practice to seek and obtain all available information associated with the public records made available by government agencies and to then include that information in its database for potential return. SUF ¶ 5. However, that available information can be limited. Public records often contain limited personal identifiers, and that information itself varies significantly across jurisdictions. SUF ¶ 6. For instance, some records do not include middle names and others lack full dates of birth or any age information. *Id*. Social Security numbers are very rarely provided, nor addresses. *Id*. Some jurisdictions collect and report demographic data such as height, weight, and race (which, in any event, is inherently subjective and unreliable), while others omit such information from the information available in the public record. *Id*. ███████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

    ███████████████████████████████

████████████████████████████████████

████████████████████████████████████

[redacted]

[redacted]

As of March 2016, when the screening report at issue was generated, RealPage's software

[7] This "follow me" feature excludes national searches of sex offender registry records, which are mandated to be returned by HUD regulations. *See* 24 C.F.R. § 960.204 (discussing how HUD regulations that prohibit sex offenders in public housing require national sex offender screening).

and matching logic had been developed and refined over more than twenty years through the expenditure of thousands of employee hours and internal testing as to various matching permutations in order to achieve the most accurate possible matching logic.  SUF ¶ 17.

Using the process detailed above, RealPage's licensed software will return all available information from RealPage's database regarding the offense and offender with respect to any criminal record that is matched by the software using the available data.  SUF ¶ 18.  The records returned reflect demographic information related to the criminal defendant, as well as any pictures whenever available.  SUF ¶ 19.  The information in the tenant screening report is also displayed in an easy-to-read manner to enable property managers to verify the information in the report pertains to the potential tenant.  SUF ¶ 20.  The information provided further explicitly directs the landlord to take steps to verify that any returned records are properly attributable to the applicant because the property manager has often had face-to-face interaction with the applicant.  SUF ¶ 21.

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████  RealPage also is not aware of any trend or higher rate of disputes with respect to records returned by its software that originated from the Kentucky

Department of Corrections or the Wisconsin Sex Offender Registry, which (as discussed below) are the jurisdictions where the three records that were disputed by Plaintiff originated. SUF ¶ 26.

## B. RealPage's Process for Responding to Customer Disputes

RealPage recognizes the importance of resolving disputes and has developed procedures to aid landlords in helping consumers who may have had records reported that did not actually belong to the applicant. SUF ¶ 32. To that end, RealPage maintains written and unwritten policies and procedures to ensure that it conducts reasonable reinvestigations with respect to consumer disputes, in compliance with its obligations under the FCRA. SUF ¶ 33. Those guidelines concern, among other things, RealPage's process for handling consumer disputes of information contained in the criminal section of a consumer's tenant screening report and cover various aspects of the dispute process, including: receiving the disputed information from a consumer, opening a case for the consumer in the software it uses for customer relationship management, conducting an investigation of the disputed information, communicating the results of the investigation to all necessary parties depending on the results of the investigation, completing the reinvestigation in a timely manner, and suppressing the record if the investigation of a consumer criminal dispute results in the removal or update of a record. SUF ¶ 34. RealPage's employees also receive extensive training about the requirements of the FCRA, including how to handle consumer disputes in a manner that is compliant with the FCRA. SUF ¶ 35.

## C. Tenant Screening Report Pulled by Midtown Estates

In March 2016, Plaintiff applied for housing at Midtown Estates ("Midtown"). SUF ¶ 36. Midtown used RealPage's LeasingDesk software, as described above. SUF ¶ 39.[8] Upon receipt

---

[8] When filling out his application, Plaintiff intended to live with his long-term girlfriend of twelve years (Nikki Peters) at Midtown, but he intentionally omitted her information from his application because Midtown is reserved for low-income tenants and their combined income would have been too high to secure the desired housing if Plaintiff had truthfully disclosed his intended living arrangement. SUF ¶ 37. Thus,

10

of Plaintiff's rental application, Midtown entered identifying information into the LeasingDesk software to generate a tenant screening report. *Id.* Specifically, the property manager, Carol Minks, entered the following information into LeasingDesk relating to Plaintiff: (1) his name, Davone Jamal Jackson; (2) his gender; (3) his current address; (4) his Social Security number; (5) his driver's license number; and (6) his full date of birth. SUF ¶ 40.

Using the information input by Midtown into RealPage's software application, RealPage's software identified criminal records from Tennessee, Kentucky, and Wisconsin. SUF ¶ 41. Those records had been previously obtained by a longstanding vendor for RealPage (Genuine Data Services, LLC) directly from Rutherford County, Tennessee, the Kentucky Department of Corrections, and the Wisconsin Sex Offender Registry. SUF ¶ 42. The report advised Midtown that it "should review the offender physical description and/or photo, if available, for any criminal record returned. You can do this by clicking here." SUF ¶ 43.[9]

Plaintiff challenges the three public records that were returned from Kentucky and Wisconsin. SUF ¶ 44. Plaintiff did not dispute that the Tennessee record for drug offense conviction, and he admits that he was the offender and that the offense was accurately set forth in the screening report. SUF ¶ 45. █████████████████████████████

████████████████████████████████████████████████████████████

---

Plaintiff should have never moved into the apartment for income reasons alone. Additionally, no criminal screening was conducted by Midtown on Ms. Peters due to the fact that she was omitted from Plaintiff's application. Ms. Peters testified, however, that she had previously been arrested for assault. SUF ¶ 38.

If this case survives summary judgment, RealPage reserves all rights to argue that Plaintiff would not have been granted housing due to this fraudulent application process and evasion of income restrictions and failure to list Ms. Peters on the application, independent from any reporting by RealPage.

[9] A copy of the report was not sent to Plaintiff, as Midtown did not indicate that Plaintiff had requested to receive such a copy. SUF ¶ 51. If such a request was indicated by Midtown, a copy would have been sent to Plaintiff at that time. *Id.* Midtown itself, however, had available a copy of the report to show and discuss with Plaintiff, as a copy was available through the LeasingDesk product portal. SUF ¶ 52.

11



As is evident from the report, the name associated with the two Kentucky records was "James Jackson," and the report included a photo of the offender.  SUF ¶ 49.  The name associated with the one Wisconsin criminal record was "Eric D. Jackson."  SUF ¶ 50.

SUF ¶ 11.  Plaintiff is a stark example of the reason for such matching logic:  he spelled his first name multiple different ways in his communications with Midtown and RealPage (*e.g.*, "DaVone"; "Davone"; "DaVone Jerro"; "Da'Vonejerro"; and "DaVonejerro").  SUF ¶¶ 26-30.

Based on the records returned, Ms. Minks informed Plaintiff that he did not qualify for housing because of the criminal convictions on the report.  SUF ¶ 53.  At that time, Plaintiff told Ms. Minks that the Kentucky and Wisconsin criminal reports did not belong to him.  SUF ¶ 54. Ms. Minks testified that she knew at that time that the disputed records did not belong to Plaintiff, and that her belief was confirmed by the picture in the report associated with one of the crimes was not of Plaintiff.  SUF ¶ 55.  Ms. Minks further advised Plaintiff during their March 2016 conversation that he had ten days to appeal the decision.  SUF ¶ 56.  Though Ms. Minks had the option to submit a dispute of the records directly to RealPage, she did not do so.  SUF ¶ 57.

12

The property's management company, Ms. Minks's employer, also had the final say of whether to accept Plaintiff's application. The decision suggested by RealPage's software was based on the criteria Midtown established; RealPage did not make the decision. SUF ¶ 58.

Despite being told that he had ten days to appeal the decision, Plaintiff waited until October 31, 2016, to contact RealPage to dispute the applicability of the Wisconsin and Kentucky records, which was over seven months after the screening. SUF ¶¶ 59-60. RealPage had never previously been made aware of any claim that Plaintiff disputed the applicability of these records to him. SUF ¶ 61. On November 17, 2016, RealPage responded to Plaintiff's dispute, confirming to Plaintiff that the Kentucky and Wisconsin records did not belong to him.[10] SUF ¶ 62. At the same time, RealPage informed Midtown of the removal of the Kentucky and Wisconsin records from Plaintiff's report. SUF ¶ 64. Midtown then approved Plaintiff's application for housing. SUF ¶ 64. Once an apartment was available, Plaintiff moved into the Midtown complex in February 2017, where he continues to reside to this day. SUF ¶ 65. RealPage's software has not been used to generate any other screening reports on Plaintiff for another customer apart from the original March 2016 report at issue in this action. SUF ¶ 66.

## IV.    LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of showing the absence of any such "genuine issue" rests with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court

---

[10] Plaintiff claims that he did not receive these results. If so, that would be because his attorney provided the wrong return email address to RealPage in the dispute (*i.e.*, djjackson1980@gmail.com, instead of his actual email address, djjjackson1980@gmail.com).

13

must view the evidence in the light most favorable to the non-moving party. *Unites States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Once the movant satisfies its initial burden, the burden shifts to the party opposing the motion, which may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Gardner v. City of Cleveland*, 656 F. Supp. 2d 751, 757 (N.D. Ohio 2009). "The mere existence of a scintilla of evidence support[ing] plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, at 248-49 (1986)).

## V. LEGAL ARGUMENT

### A. RealPage Did Not Negligently Violate § 1681e(b)

Section 1681e(b) requires a CRA to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates" when preparing a consumer report. 15 U.S.C. § 1681e(b). A claim under § 1681e(b) requires proof that: "(1) the defendant reported inaccurate information about the plaintiff; (2) the defendant either negligently or willfully failed to follow reasonable procedures to assure maximum possible accuracy of the information about the plaintiff; (3) the plaintiff was injured; and (4) the defendant's conduct was the proximate cause of the plaintiff's injury." *Nelski v. Trans Union, LLC*, 86 F. App'x 840, 844 (6th Cir. 2004). Plaintiff bears the burden of proof as to each element of the claim, which can consist of evidence regarding the defendants' dispute volumes, expert testimony regarding industry standards, and a plaintiff's articulated liability theories and factual evidence as to how the defendant could have allegedly conducted the matching processes in dispute more effectively/efficiently. *See, e.g., id.* at 846-848; *Wenning v. On-Site Manager, Inc.*, No. 14cv9693, 2016 WL 3538379, at *60-61 (S.D.N.Y. June 22, 2016).

14

Further, it is well established that "an objective standard is used to assess whether a credit reporting agency has in place and followed reasonable procedures to assure that its credit reports achieve maximum possible accuracy," and that such a standard is applied as of the time that the report at issue was generated. *Villaflor v. Equifax Info. Servs.*, 2010 U.S. Dist. LEXIS 83314, at *4-5 (N.D. Cal. July 21, 2010) (internal citations omitted).

"[T]he FCRA does not impose strict liability for incorrect information"; a mere showing of inaccuracy on a report is not enough to prevail on a § 1681e(b) claim. *Id.* Instead, liability can only be established through proof that a defendant failed to follow reasonable procedures to assure accuracy concerning a consumer's information. *Bryant v. TRW. Inc.*, 689 F.2d 72, 78 (6th Cir. 1982). Furthermore, § 1681e(b) does not limit its statutory mandate to blocking the reporting of inaccurate information. The mandate for "accuracy" applies equally to ensuring that information attributable to the applicant is *also* reported. *See* 15 U.S.C. § 1681e(b) (the statutory mandate for "accuracy" is not textually limited to avoiding claims of potentially misattributed records).

For a credit reporting company like RealPage, therefore, the obligation to maintain reasonable procedures to assure maximum possible accuracy thus involves balancing the risk of false positives and false negatives.[11] To that end, the Court's assessment of RealPage's motion should consider instances where landlords have failed in their duty to run effective background

---

[11] Indeed, failing to detect prior criminal convictions can lead to tragedy. In *Beverly v. Diamond Transportation Srvs, Inc.*, No. 98-2230 (4th Cir. 1999), for instance, a mentally-disabled woman was raped by a newly-hired bus driver who was not required to undergo a background check. The bus driver, however, was a felon with prior convictions. [http://www.ca4.uscourts.gov/opinions/Unpublished/982230.U.pdf.] Other examples abound. *Mulloy v. United States*, 884 F.Supp.622 (D. Mass. 1995) (wife of an army officer was raped and murdered by another enlistee living on the army base after the army screened the enlistee, but failed to uncover the enlistee's criminal history which included aggravated burglary and rape, burglary and attempted theft, and several weapons charges); *see also Allstate Ins. Co. v. Tenant Screening Services, Inc.*, 914 P.2d 16, 17 (1996) (a tenant was sexually abused by another tenant after the screening report failed to disclose the other tenant's criminal history). When considering summary judgment, the Court must thus keep in mind the critical role that screening companies play in avoiding false negatives.

15

checks on applicants and crimes have consequently resulted, and also the untold number of instances where landlords, due to their access to an efficient background check industry, have successfully screened out criminals and avoided crimes on their properties. RealPage's procedures account for all such issues.

### 1. Plaintiff's discovery responses proposed only a theory of strict liability, which is contrary to law and requires judgment for RealPage.

Plaintiff's only stated theory of liability for his § 1681e(b) claim is that, because his screening report contained records that did not belonging to him, RealPage failed to follow reasonable procedures to ensure the accuracy of its reporting. *See* Compl. ¶¶ 6-18. Stated differently, Plaintiff has invoked the very same "strict liability" theory of liability that has been uniformly rejected by courts in the Sixth Circuit. *See, e.g.*, *Nelski*, 86 F. App'x at 844.

That, however, was not a defect in pleading that was later cured in discovery. Instead, Plaintiff "doubled down" on that same strict liability theory in his sworn interrogatory responses. For instance, Interrogatory No. 4 from RealPage requested that Plaintiff "state all facts supporting Plaintiff's allegation that RealPage did not comply with its obligations under the FCRA § 1681e," including "each way that Plaintiff contends that RealPage's actions were unreasonable with respect to the screening report at issue, as well as what actions Plaintiff contends that RealPage should have taken to ensure compliance with the statute." SUF ¶ 67. In response, and "notwithstanding his objections" to this straightforward and proper contention interrogatory,[12] Plaintiff stated:

> Defendant does not have reasonable procedures to assure the maximum possible accuracy of the consumer reports that it sells. As a result, Defendant prepared and

---

[12] Contention interrogatories are important in that they "help pin down an opponent's legal theories in a case as well as the primary facts supporting them." *Jayne H. Lee, Inc. v. Flagstaff Indus. Corp.*, 173 F.R.D. 651, 652 (D. Md. 1997). Furthermore, contention interrogatories play a critical role for defendants, especially in asymmetrical consumer actions such as this case, because "[o]nly [a] plaintiff can identify its own contentions and the burden on defendants to try and divine plaintiff's contentions from documents obviously imposes a greatly unequal burden on defendants." *SEC v. Elfindepan*, 206 F.R.D. 574, 577 n.5 (M.D.N.C. 2002).

16

sold a consumer report about Plaintiff that contained inaccurate and highly derogatory personal and criminal information that did not belong to Plaintiff.

SUF ¶ 68. That response improperly conflates inaccuracy with "unreasonable" procedures. Indeed, Plaintiff failed to identify *any* procedures that he claims were unreasonable or what he claims should have been done differently by RealPage. And, his interrogatory responses were never supplemented at any point during the discovery period. SUF ¶ 71.

Here, the *only* liability theory identified by Plaintiff under § 1681e(b) is a strict liability approach to the statute that has been rejected by the Sixth Circuit. Indeed, if summary judgment is not granted now, RealPage will be forced to proceed to trial without *any idea* as to how Plaintiff intends to litigate his case relative to the procedures that were actually employed by RealPage's software in connection with the March 2016 request by Midtown. The Federal Rules of Civil Procedure prevent that type of litigation tactic. *See, e.g.*, *Krippelz v. Ford Motor Co.*, 750 F. Supp. 2d 938, 957 (N.D. Ill. 2010) (seeking to assert theories of liability not mentioned in response to contention interrogatories is prohibited under FRCP 26(e) and 37(c)(1)). Accordingly, RealPage is entitled to summary judgment on Plaintiff's negligent violation of §1681e(b) claim. *See, e.g.*, *Cambridge Elecs. Corp. v. MGA Elecs., Inc.*, 227 F.R.D. 313, 334 (C.D. Ca. 2004) (holding that "summary judgment is appropriate" because the plaintiff failed to identify factual contentions made by a declarant in opposition to summary judgment "in its responses to defendants' interrogatories regarding the fraudulent transfer claim.").

   2.   **The record evidence proves that RealPage acted reasonably, and Plaintiff lacks any contrary proof.**

RealPage utilized reasonable procedures in creating Plaintiff's report, and no evidence to the contrary exists.[13] RealPage has expended extensive resources, including thousands of

---

[13] There has been no issue raised in this case with the accuracy or completeness of the actual records returned by RealPage. Rather, the only issue is their applicability to Plaintiff.

17

employee hours, to develop software licensed by landlords that utilizes a matching logic that optimally balances false positives and false negatives. SUF ¶ 17. That software development and optimization process has involved extensive analysis of various matching "logics" and permutations of the software's algorithm. *Id*. Indeed, matching on two identifiers (*e.g.*, name and dates of birth) is accepted industry standard. In its 2015 report on criminal record checks for employment, an analogous use of public record information, the Government Accountability Office ("GAO") observed that "using personal identifying information in addition to an individual's name when conducting a check, such as the person's date of birth, can minimize false positives and false negatives."[14] NAPBS has adopted a similar standard as part of its accreditation process, the Background Screening Agency Accreditation Program ("BSAAP"), and it recommends that CRAs adopt "matching a minimum of two identifiers which may include name, date of birth, SSN, current and previous addresses, and/or driver's license number." [15]

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████ For example, criminal applicants often try to avoid detection by submitting false information.

---

[14] *See* U.S. Government Accountability Office Report to Congressional Requesters, *Criminal History Records: Additional Actions Could Enhance the Completeness of Records Used for Employment-Related Background Checks,* GAO-15-162, p. 38 (Feb. 2015), available at https://www.gao.gov/assets/670/668505.pdf (last accessed 8/25/17). *See also NAPBS Position: Availability of Identifiers in Public Records* (stating that "[H]aving an individual's complete date of birth in public record data helps ensure they are matched with the correct data").

[15] NAPBS's BSAAP Standards located at http://pubs.napbs.com/pub/D57EDE10-A720-5C5D-BBCE-21CBC45A276C. NAPBS is a non-profit trade association that represents over 900 companies offering employment and tenant background screening services. Accordingly, the NAPBS's accreditation standards largely reflect the current industry best practices for CRAs that offer background screening for employment and tenancy purposes.

Offenders often present false information numerous times (including when arrested).[16]  For that reason, ██████████████████████████████████████████████████████████████████

████████████████



RealPage's processes account for these possibilities.



---
[16] For example, an academic study found that sex offenders frequently manipulate their identity to escape detection, including by using multiple aliases, manipulating their names, using the address of family members or friends, using the identifying information of family members, or altering their date of birth. *See generally* Center for Identity Management and Information Protection, *Hiding in Plain Sight? A Nationwide Study of the Use of Identity Manipulation by Registered Sex Offenders* (February 2015).  The study found that roughly 42 percent of offenders in the National Sex Offender Registry have multiple names, Social Security numbers, dates of birth, or other identity indicators, and that nearly 17 percent of offenders attempt to manipulate their identities.  *Id.* at 70, 75.

19

███████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

████████████████████████ The records returned also provided demographic information of the offender to the landlord, including one photograph, so that any issues with the attribution of the records could be quickly resolved. SUF ¶ 41. The software further instructed Midtown that Midtown was to review all identifying information associated with the record to ensure the applicability of the record to the applicant. SUF ¶ 43.

The reasonableness of these processes has also been empirically validated by RealPage's dispute tracking systems. RealPage's use of the matching logic in its licensed software has resulted in a remarkably low consumer dispute volume ████████████████, *see* SUF ¶ 25, when compared to the overall volume of criminal record screening requests from 2015-2017, which confirms the validity and systemic accuracy of the software's matching algorithm. *See, e.g.*, *Bynum v. Cavalry Portfolio Servs., LLC*, No. 04-cv-0515, 2005 WL 2789199, at *16 (N.D. Okla. Sept. 29, 2005) (error rate of one percent required judgment on issue of "reasonable" procedures).

Fundamentally, Plaintiff has not asserted any theory of liability – nor provided any actual evidence – that RealPage failed to follow reasonable procedures in violation of § 1681e(b) in connection with Midtown's use of RealPage's software. That lack of proof also warrants summary judgment. *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 566 (6th Cir. 2001) (summary judgment is proper where a moving party shows an "absence of evidence to support the non-

---

[17] Indeed, in its examination of data matching required by the FACT Act, the FTC concluded in its report to Congress that mandatory matching rules would be likely to lower match efficiency and stated that "[a] matching process is efficient if the number of incorrect matches cannot be reduced without also reducing correct matches, or vice-versa." https://www.ftc.gov/sites/default/files/documents/reports/under-section-318-and-319-fair-and-accurate-credit-transaction-act-2003/041209factarpt.pdf at p. 47.

20

moving party's case.") (quoting *Celotex Corp.*, 477 U.S. at 325)).  For all of these reasons, the

Court should grant summary judgment in favor of RealPage.

### B.  RealPage Did Not Willfully Violate § 1681e(b)

Even if a court concludes a defendant negligently violated the FCRA, unless the conduct

was objectively unreasonable (*i.e.*, intentional or in "reckless disregard" of the law), the defendant

cannot be held liable for willfully violating the statute.  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S.

47, 69-70 (2007).  Recklessness consists of "action entailing an unjustifiably high risk of harm that

is either known or so obvious that it should be known."  *Moore v. First Advantage Enter.*

*Screening*, No. 4:12CV792, 2013 U.S. Dist. LEXIS 54907, at *24 (N.D. Ohio. Apr. 17, 2013).

"Willfulness" can, and should, be decided as a matter of law.  The Sixth Circuit recently

provided clear guidance on FCRA willfulness claims, and §1681e(b) in particular.  In *Smith v.*

*LexisNexis Screening Solutions, Inc.*, the employer provided LexisNexis with the plaintiff's first

name, last name, and date of birth and requested a screening report.  837 F.3d at 608.  In preparing

its report, LexisNexis returned credit information that was not attributable to the plaintiff.  A jury

determined that LexisNexis negligently and willfully violated § 1681e(b).  *Id.* at 609.

The Sixth Circuit affirmed the negligence verdict, though it was a "close call."[18]  *Id.* at 610.

With respect to willfulness, however, the court reversed, cautioning that mere negligence is a "far

cry from being willful."  *Id.*  The Sixth Circuit acknowledged and rejected the plaintiff's argument

that LexisNexis should have required a more restrictive matching procedure, holding:

> These procedures have kept Lexis's dispute rate at just .2%, which is remarkably
> low. Furthermore, a single inaccuracy, without more, does not constitute a willful
> violation of the FCRA.  Although this inaccuracy might have resulted from Lexis's
> carelessness, ***it did not result from Lexis's disregarding a high risk of harm of***

---

[18] For the reasons set forth above, RealPage submits that this case is not a "close call" and that the facts of
the case presents an even stronger case in favor of summary judgment.  Moreover, the Sixth Circuit in *Smith*
did not consider any issues regarding the plaintiff's deficient discovery responses or the plaintiff's complete
lack of any evidence supporting his claims, as is the case here.

> **which it should have known.**  The district court thus should have granted judgment as a matter of law with respect to the willfulness claim.

*Id.* at 610-11 (citing *Nelski*, 86 F. App'x at 844)) (emphasis added).  In reaching that conclusion, the Sixth Circuit focused on three points: (1) "the CRA's track record with its procedures had been reliable," (2) "the CRA corrected its mistake shortly after the plaintiff challenged the accuracy of the report," and (3) that "there was no evidence that other individuals had lodged complaints similar to the plaintiff's."  *Smith*, 837 F.3d at 611.  All of those factors are present here.

- **Track Record:**  The *Smith* court noted LexisNexis's reliable track record with its procedures, pointing to evidence LexisNexis "tracks its overall dispute rates for its criminal background reports" and had a "remarkably low" dispute rate of "only .2%."  *Id.* at 609, 611. ███████████████████████ ████████████████████████████████████████  SUF ¶ 25.

- **Timely Correction:**  In *Smith*, the CRA corrected the report within twenty-five days, which the Sixth Circuit considered "prompt."  837 F.3d at 608.  Here, Plaintiff faxed his dispute on October 31, 2016.  SUF ¶ 60.  RealPage completed its reinvestigation in just eighteen days, on November 17, 2016 – seven days sooner than the defendant in *Smith*.  SUF ¶ 62.

- **Similar Complaints:**  RealPage is not aware of any trend or higher rate of disputes with respect to records that it matched and returned from the Kentucky Department of Corrections or the Wisconsin Sex Offender Registry.  SUF ¶ 31.

Thus, the undisputed facts of this case are aligned with *Smith* in terms of a lack of "willfulness."

Even more, and as explained above, RealPage takes many efforts to assure the accuracy of its matching algorithm when accounting for false positives and false negatives, and its matching algorithm does not evidence a willful violation of the statute.  *See* SUF ¶ 17.  Industry standards from GAO and NAPBS also support RealPage's positions.  Plaintiff also cannot identify any authoritative Sixth Circuit guidance that would define RealPage's actions as reckless, and there is no evidence that RealPage's actions were reckless.  *See Safeco*, 551 U.S. at 70 (finding a lack of any willful violation because this was "not a case in which the business subject to the Act had the

22

benefit of guidance from the courts of appeals or the Federal Trade Commission that might have warned it away from the view it took").

In addition, the report at issue included a disclaimer populated by RealPage's software that directed the end-users to review the information in the report before concluding that it related to the applicant and to take further and independent steps to confirm proper attribution, SUF ¶ 43, which further negates any attempted inference of willfulness. *See Taylor v. CoreLogic SafeRent, LLC*, Case No. 13-cv-3435, 2014 U.S. Dist. LEXIS 184413, at * 27 (N.D. Ga. Oct. 23, 2014) (holding that a similar disclaimer refutes contention that Defendant misrepresented information willfully). Accordingly, Plaintiff cannot point to any evidence of willfulness, and his claim for a willful violation of § 1681e(b) fails as a matter of law.

### C. RealPage Did Not Violate § 1681i

Section 1681i provides that, "if the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate." 15 U.S.C. § 1681i(a)(1)(A). The dispute investigation must be completed by the consumer reporting agency within thirty days, *see id.*, and the results must be conveyed to the consumer submitting the dispute within five days after the reinvestigation is completed. 15 U.S.C. § 1681i(a)(6).

On October 31, 2016, Plaintiff submitted his dispute to RealPage by both U.S. mail and facsimile. SUF ¶ 60. RealPage promptly reinvestigated the records, and on November 17, 2016, RealPage responded to Plaintiff as follows informing him that a portion of the report was inaccurate and that RealPage confirmed the Kentucky and Wisconsin records did not belong to him. SUF ¶ 62. That same day, RealPage also emailed the property manager at Midtown (Ms.

23

Minks) informing her that "the records reported from the Kentucky Department of Corrections and the Wisconsin Sex Offender Registry do not belong to your applicant." SUF ¶ 63.

In his Complaint, Plaintiff alleges that RealPage "initially failed to respond [to the dispute] in any fashion and failed to correct the inaccurate information." Compl. ¶ 16. Plaintiff reiterated this liability theory in response to RealPage's contention interrogatory on this claim, simply stating that "RealPage failed to properly investigate Plaintiff's disputes and therefore the inaccurate information remained on Plaintiff's RealPage report." SUF ¶ 70. Those claims are false. RealPage responded to both Plaintiff and the property manager within eighteen days of receiving the dispute, confirming that the disputed records had appeared in error on the March 2016 report. SUF ¶¶ 60, 62-63. [19] Thus, Plaintiff's claim under § 1681i must be dismissed with prejudice.

## VI. CONCLUSION

For the foregoing reasons, RealPage, Inc. respectfully requests that the Court: (1) grant its Motion for Summary Judgment, thereby dismissing this action against it with prejudice; and (2) grant RealPage such other and further relief as may be appropriate.

Dated: January 3, 2019                    By: /s/ Ronald I. Raether

---

[19] The only further communication between Plaintiff and RealPage after November 2016 came in February 2017 when Plaintiff submitted a request for a consumer file disclosure to RealPage. SUF ¶ 72. RealPage responded, although the file provided to Plaintiff inadvertently included the disputed Kentucky records. SUF ¶ 73. However, the contents of that file disclosure cannot serve as the basis for a claim here, because there was no disclosure of an "inaccurate" file to a third party. *See* 15 U.S.C. § 1681g(a); *Wantz v. Experian Info. Solutions, Inc.*, 386 F.3d 829, 834 (7th Cir. 2004) ("[W]here there is no evidence of disclosure to a third party, the plaintiff cannot establish the existence of a consumer report.").

24

RONALD I. RAETHER, JR. (*pro hac vice*)
Bar Number: CA 303118
TROUTMAN SANDERS LLP
5 Park Plaza, Suite 1400
Irvine, California 92614
Telephone: (949) 622-2722
Facsimile: (949) 622-2739
ron.raether@troutman.com

Zachary D. Miller (BPR #032674)
Samuel A. Morris (BPR #034878)
BURR & FORMAN LLP
222 Second Avenue South., Suite 2000
Nashville, TN 37201
Telephone: (615) 724-3200
zmiller@burr.com
smorris@burr.com

*Attorneys for RealPage, Inc.*

25